NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporters@sjc.state.ma.us

19-P-1163                                    Appeals Court

  HENRY W. COMSTOCK, JR., trustee,[1] & another[2] vs.  ZONING BOARD
              OF APPEALS OF GLOUCESTER & others.[3]


                          No. 19-P-1163.

         Essex.      May 6, 2020. - August 3, 2020.

            Present:  Vuono, Milkey, & Desmond, JJ.


Zoning, Nonconforming use or structure, Special permit,
     Variance, Height restriction, Accessory building or use.
     Practice, Civil, Zoning appeal.  Municipal Corporations,
     By-laws and ordinances.



        Civil action commenced in the Superior Court Department on
June 29, 2017.

        The case was heard by Janice W. Howe, J., on a motion for
summary judgment.


        Mark L. Nestor for Robert Irwin & another.
        Liam T. O'Connell for the plaintiffs.
        Krisna M. Basu, Assistant General Counsel, for zoning board
of appeals of Gloucester.

_____

        [1] Of the 132 1/2 Wheeler Street Realty Trust.

        [2] Walter Donovan, individually and as trustee of the Walter
C. Donovan Trust - 2007.  Sarah Donovan was a nominal plaintiff
but did not participate in the appeal.

        [3] Robert Irwin and Pamela Irwin.

MILKEY, J.  This is a zoning dispute between the owners[4] of adjacent waterfront parcels in Gloucester.  On the parcel owned by the defendants Robert and Pamela Irwin, there is a residence and a detached, one-car garage.  The garage is dilapidated, and in 2017, the Irwins sought local approval to tear it down and to replace it with a new garage on the same footprint.  The plaintiff Walter Donovan -- whose property directly abuts the Irwins -- spoke in support of the Irwins' project at the hearing before the defendant zoning board of appeals (ZBA).  On May 11, 2017, the ZBA unanimously approved the project, issuing two special permits and two variances.

Notwithstanding his initial support for the replacement of the garage, Donovan filed an action pursuant to G. L. c. 40A, § 17, challenging the ZBA's approval.  A Superior Court judge granted summary judgment in Donovan's favor on the ground that the Irwins needed -- in addition to the four approvals they had received -- a variance with respect to the height of the proposed garage.  In reaching her conclusion, the judge relied on our decision in Deadrick v. Zoning Bd. of Appeals of Chatham,

_____

[4] Henry W. Comstock, trustee of 132 1/2 Wheeler Street Realty Trust, holds title to 132 1/2 Wheeler Street via a nominee trust that has one beneficiary, the Walter C. Donovan Trust - 2007.  Walter C. Donovan is the sole trustee and sole beneficiary of the Walter C. Donovan Trust - 2007.

85 Mass. App. Ct. 539 (2014). We reverse and take this opportunity to clarify the meaning of Deadrick.[5]

Background. 1. Proposed garage. As noted, the proposed garage would have the same footprint as the existing one. That footprint is a thirteen by twenty-three foot rectangle, with the short sides lying parallel to the street and the long sides lying parallel to the boundary between the parties' properties. The side of the garage facing Donovan's property lies approximately five feet from the property line, well short of the ten-foot side-yard setback required by the applicable zoning ordinance.

The proposed garage differs from the existing one principally with respect to the configuration of its roof. The roof of the existing garage is unusual in that its ridgeline is parallel to the short sides of the rectangle. The Irwins propose to reorient the ridgeline so that it runs parallel to the long side of the rectangle (and thus parallel to the boundary between the lots). In this manner, the gable of the garage would now face the street.

---

[5] The ZBA also filed a notice of appeal even though it elected not to participate in the summary judgment proceedings. Donovan argues that the ZBA waived its right to appeal, and the ZBA counters that it should not be deemed to have waived its right to appeal where, as here, the judge ultimately resolved the case on a ground that she raised sua sponte. We need not resolve whether the ZBA's appeal is properly before us.

The overall height of the proposed garage would be about three feet taller than the existing garage, rising to about fifteen feet overall.[6] According to the Irwins, the added height is necessary to accommodate a standard-sized garage door, a contention Donovan has not challenged. Other details about the roof are reserved for later discussion.

2. <u>Permitting process</u>. The existing garage is considered a preexisting nonconforming structure for two reasons: the lot is undersized and the garage lies closer to the lot boundaries than allowed under current side-yard and front-yard setback requirements. The Irwins sought two special permits to allow their proposal to go forward: one seeking to modify a preexisting nonconforming structure, and the other to allow a building that exceeded the twelve-foot height limitation applicable to accessory buildings that do not comply with the setback requirements of the principal building.[7] The ZBA also treated the Irwins' application as requesting variances from

---

[6] It bears noting that with the ridgeline of the garage reoriented, the height of the proposed garage on the side closest to Donovan's property would be lower than the existing garage.

[7] Section 3.2.1 n.(d) of the city's zoning ordinance states: "If the accessory building complies with the front, side and rear yard setbacks for the principal building, the maximum building height for the accessory building shall be that of the principal building. If the accessory building does not comply with said setbacks, the maximum height shall be 12 feet."

applicable setback requirements, although the record is not clear that the Irwins actually had requested them.[8]

No one opposed the Irwins' project at the scheduled public hearing.  Three neighbors, including Donovan, spoke in favor of it.  The ZBA concluded that the proposed garage would result in a significant improvement, finding as follows:  the existing garage "can only be characterized as an eyesore on this otherwise well-maintained residential street[,]" "the rebuilt garage will be thoroughly in keeping with neighborhood character, appearance and structural density . . . [and] rotating the ridgeline of the garage so that its gabled end faces the street will vastly improve its appearance."  With regard to the increase in the overall height of the garage, the ZBA found that in light of the sloping nature of the site, the increased height was "necessary to allow for a normal eight foot high garage door and sufficient pitch of the roof."  The ZBA also found no adverse impacts from the increased height, specifically finding "that the structure will not obstruct views or overshadow other homes . . . [or] compromise utility lines or

_____

[8] On the preprinted form that the Irwins completed, they had checked a box indicating they were seeking special permits, but had not checked any box indicating that they were seeking a variance.  The completed application did note that the garage would not comply with the current side-yard setback requirement.

otherwise result in adverse neighborhood impacts."  On this basis, the ZBA issued both requested special permits.

The ZBA also approved variances from the otherwise applicable side-yard and front-yard setback requirements, reasoning as follows:

> "The board finds that literal enforcement of the applicable provisions of the zoning ordinance would involve substantial hardship to petitioners, in that their present garage is clearly in need of replacement and the steep sloping contours of their undersized lot dictate that the new garage be sited precisely where the old one was, at the high end of the Site, close to the street. . . .  The board also finds that the topographic constraints presented by this case are unique to petitioners' property and not generally applicable to their zoning district.  Finally, the board finds that petitioner[s'] new garage will be consistent with neighborhood appearance and structural density."

At the same time that it allowed these variances, the ZBA questioned whether they even were necessary, commenting "that the new garage will not intrude any further into side and right front yard setbacks than the garage that it is replacing; indeed, there is some question under Deadrick whether a variance is even required."

The ZBA noted that although Donovan spoke in support of the Irwins' proposal, he did express "a concern whether the new orientation of the garage might create flooding onto his

property."[9]  As the ZBA explained, it "dealt with this issue by requiring that a drainage plan be prepared and submitted to the Engineering Department for approval."  Why this resolution did not satisfy Donovan's stated drainage concerns is not entirely clear on the limited record before us.[10]  In addition, tension arose over the state of the retaining wall that separated the two properties and the exact location of the boundary line.  In any event, the relationship between the neighbors deteriorated, and Donovan commenced this action.

3.  <u>Trial court ruling</u>.  The Irwins moved for summary judgment.  With respect to the two special permits, they argued that in light of the undisputed underlying facts, the wording of the applicable ordinance provisions, and the deference owed to the ZBA, no serious challenge could be mounted to the ZBA's

---

[9] For this reason, Donovan later characterized his position at the hearing as one of "conditional[] support[]."

[10] According to Donovan's deposition testimony, the Irwins were "vague" about their specific drainage plans, and they stated they were not going to submit the required drainage plan to the city (claiming that the city engineer told them they did not have to do so).  The Irwins paint a starkly different picture.  By contrast, in her deposition testimony, Pamela Irwin claimed that she and her husband were forthcoming with Donovan and told him that water from the roof's gutters would be directed into a dry well on their property, and they stood ready, willing, and able to submit a drainage plan to the city.  The record indicates that the drainage issues also arose in a separate proceeding before the city's conservation commission, although little detail about that proceeding has been included in the record before us.

decision to issue the special permits. With respect to the variances, they argued that no variances in fact were required, so that the judge need not consider the validity of the ZBA's issuance of them. After the hearing, the judge not only denied the Irwins' motion, but also granted summary judgment in favor of Donovan. See Mass. R. Civ. P. 56 (c), as amended, 436 Mass. 1404 (2002). Relying on Deadrick, the judge ruled that the Irwins needed an additional variance -- not merely a special permit -- to exceed the applicable height restriction. The judge did not reach the dispute over whether variances were needed with regard to the setback issues.

Discussion. 1. Protection offered by statute and ordinance. Section 6 of G. L. c. 40A provides a certain level of protection to all structures that predate applicable zoning restrictions.[11] See Bellalta v. Zoning Bd. of Appeals of Brookline, 481 Mass. 372, 376-377 (2019) (explaining structure

_____

[11] Providing such protection commonly is known -- in the case law and otherwise -- as "grandfathering." We decline to use that term, however, because we acknowledge that it has racist origins. Specifically, the phrase "grandfather clause" originally referred to provisions adopted by some States after the Civil War in an effort to disenfranchise African-American voters by requiring voters to pass literacy tests or meet other significant qualifications, while exempting from such requirements those who were descendants of men who were eligible to vote prior to 1867. See Webster's Third New International Dictionary 987 (2002) (definition of "grandfather clause"); Benno C. Schmidt, Jr., Principle and Prejudice: The Supreme Court and Race in the Progressive Era, 82 Colum. L. Rev. 835 (1982).

of G. L. c. 40A, § 6).  Generally speaking, preexisting
nonconforming structures lose the protection provided by the
statute when the structures are extended or structural changes
are made to them.  Rockwood v. Snow Inn Corp., 409 Mass. 361,
364 (1991).  However, if the structure in question is a single-
or two-family residence, the statute provides an additional
layer of protection.  Bellalta, supra.  Such structures can be
modified, extended, or reconstructed as of right "so long as the
'extended or altered' structure 'does not increase' its
'nonconforming nature.'"  Id. at 377, quoting G. L. c. 40A, § 6.
Moreover, even where the changes do increase the nonconforming
nature of a protected residence, they still can be undertaken by
special permit so long as the permit granting authority finds
"that the proposed modification would not be 'substantially more
detrimental' to the neighborhood than is the existing
nonconformity."  Bellalta, supra at 377-378.  See Gale v. Zoning
Bd. of Appeals of Gloucester, 80 Mass. App. Ct. 331, 336-338
(2011).[12]

The protection that the statute offers to preexisting
nonconforming one- and two-family residences does have limits.
Where the modification or reconstruction would add an additional

---

[12] It bears noting that Gale involved an increase in a
setback nonconformity under the same zoning ordinance applicable
here.

nonconformity to existing ones, then it is not sufficient for the owner to obtain a special permit based on a finding that the change will not be substantially more detrimental to the neighborhood. <u>Deadrick</u>, 85 Mass. App. Ct. at 547-553. Rather, the owner would need to obtain a variance to allow the additional nonconformity. <u>Id</u>.

The Irwins' garage is not itself a single- or two-family residence, but instead is a freestanding structure used for an accessory purpose. Donovan argues that it therefore does not enjoy the extra layer of protection that the statute provides to single- and two-family residences. We need not resolve that issue, however, because municipalities are free to adopt more forgiving rights so long as they do so explicitly. See <u>Marinelli</u> v. <u>Board of Appeals of Stoughton</u>, 65 Mass. App. Ct. 902, 903 (2005).[13] Here, the city has adopted a zoning ordinance

---

[13] Although we do not reach the question whether the Legislature intended that the extensive statutory protection afforded to one- and two-family residences also applies to buildings that serve as accessory structures to such residences, we do note that at least one case touches on that issue. In <u>Bjorklund</u> v. <u>Zoning Bd. of Appeals of Norwell</u>, 450 Mass. 357, 362-363 (2008), the Supreme Judicial Court set forth certain examples of "small-scale alterations, extensions, or structural changes to a preexisting house" that nevertheless could be allowed as of right because they did not increase the nonconforming nature of the residence. The addition of small storage sheds is included on that list. <u>Id</u>. at 362. Also included is the addition of a one-story, two-car garage, without mention of whether such a garage was attached or freestanding. <u>Id</u>.

that extends to accessory structures the same extra level of protection that applies to the single- and two-family residences that such structures serve. Section 2.4.4 of the ordinance (which exempts some projects involving prior nonconforming single- and two-family residences from the need even for a special permit) states that "the term 'single and two-family residence' shall include accessory structures to such residences." Similarly, § 2.4.3, which, inter alia, authorizes the issuance of special permits for modifications to preexisting nonconforming structures that "will not be substantially more detrimental to the neighborhood," expressly applies to the "reconstruction of a single or two-family residence or an accessory structure thereto."

2. Whether variance is needed for height. Relying on our decision in Deadrick, the judge concluded that because the proposed garage would not comply with the otherwise applicable twelve-foot height limit, the Irwins needed to secure a variance from that limit. A close examination of Deadrick reveals the flaw in that reasoning.

Deadrick, 85 Mass. App. Ct. at 540-541, involved the replacement of a preexisting nonconforming home in a coastal zoning district that had a twenty-foot height restriction. The local zoning board issued a special permit allowing the project even though it was uncontested that the new home would be more

than twenty feet tall. Id. at 540. Concluding that the new home would create an additional nonconformity (a violation of the height limit), a Land Court judge ruled that the project required a variance. Id. at 540-541. We concluded that the judge's reasoning that a variance would be required would be correct if his premise were correct that the project would create an additional nonconformity. Id. at 545. Key to our reasoning was that a contrary ruling would create a gross disparity between how owners of conforming structures and owners of nonconforming structures would be treated: an owner of an existing conforming structure could not build an addition that created a dimensional nonconformity without a variance, while an owner of preexisting nonconforming structure could do so based merely on a finding that the change would not cause substantial detriment to the neighborhood. Id. at 553 (stating that such disparate treatment revealed "fallacy" of argument that variance was not required for additional nonconformity).

At the same time, however, we pointed out in Deadrick that the local zoning board had not addressed whether the proposed home would be entitled to an exemption from the height restriction.[14] Id. at 545-547. If the proposal were entitled to

---

[14] Under the relevant zoning bylaw, a homeowner was exempted from the height restriction to the extent that the additional height was driven by the need to comply with regulations imposed

such treatment, then the premise of the judge's ruling -- that the proposal would introduce an additional nonconformity -- would be in error.  We therefore vacated the judgment and remanded the case for a determination whether the new home in fact would be bound by the height limit, or could win an exemption from it (in which case no variance would be required). Id. at 544-547, 553-554.

In the case before us, § 3.2.1 of the zoning ordinance allows owners to build accessory structures up to twelve feet high even where the structure does not comply with setback requirements.[15]  It also allows owners to exceed that height if they secure approval through a separate special permit process open to the owners of conforming structures and nonconforming structures alike.  Those who secure approval to exceed the twelve-foot height restriction in this manner would not be creating a new nonconformity; they would be proceeding in full compliance with the provisions governing maximum building height.  Just as the property owners in Deadrick would not need a variance if the local zoning board were to determine on remand

_____

by the Federal Emergency Management Agency.  Deadrick, 85 Mass. App. Ct. at 544 & n.5.

[15] In fact, had the proposed garage complied with the setbacks applicable to the Irwin home, it could have been as tall as that home (up to thirty feet).  Because of the setback nonconformities here, the twelve-foot height limit applied.

that they were entitled to an exemption from the otherwise applicable height restriction there, so too the Irwins need not seek a variance from the height restriction here given that the ZBA has determined that they are entitled to increased height under the separate special permit process devoted to that question.[16]  Properly read, Deadrick supports the Irwins, not Donovan.  The judge erred in concluding that the Irwins needed a variance for their garage to exceed twelve feet in height.

3.  Whether variance is needed for setback nonconformities. Having concluded that the judge improperly granted summary judgment to Donovan, we turn to whether summary judgment should have entered in favor of the Irwins.  To succeed in challenging the two special permits, Donovan would have to show that the ZBA's issuance of them was "based on a legally untenable ground, or [was] unreasonable, whimsical, capricious or arbitrary."

---

[16] The fact that the dispensation to exceed the otherwise applicable height limit came through an approval termed a "special permit" does not change the analysis.  While cases such as Deadrick employ shorthand references to whether a given modification to a nonconforming structure can be made by special permit, the special permit process referenced is the one created by G. L. c. 40A, § 6, under which preexisting nonconforming single- and two-family residences may be altered in a way that increases the nature of an existing nonconformity so long as the project will not be substantially more detrimental to the neighborhood.  Nothing in these cases precludes owners of preexisting nonconforming residences from making use of separate municipal, generally applicable special permit provisions that offer relief from otherwise applicable dimensional requirements.

MacGibbon v. Board of Appeals of Duxbury, 356 Mass. 635, 639 (1970). In light of the limited nature of the Irwins' project, the uncontested benefits of replacing the dilapidated garage, and the fact that the ZBA addressed the only concerns that anyone had raised by requiring that the Irwins secure city approval of a drainage plan before constructing the proposed garage, Donovan cannot meet that burden.[17] Indeed, Donovan made no claim that the special permits were invalid when he opposed the Irwins' motion for summary judgment.

Instead of contesting the special permits, Donovan focused on potentially more fertile ground: the issuance of the variances from the setback requirements. See Deadrick, 85 Mass. App. Ct. at 553 (noting that property owners seeking variance face "significantly more stringent burden"). In particular, Donovan focused on the undisputed fact that although the footprint of the proposed garage would be the same as that of the existing garage, the eaves of the reconfigured roof would extend ten additional inches into the airspace of the side yard.

---

[17] As previously mentioned, see note 10, supra, Donovan has suggested that the Irwins might not comply with the requirement that they submit a drainage plan to the city's engineering department before constructing their garage. In that event, however, Donovan would have available remedies to pursue enforcement. See Barkan v. Zoning Bd. of Appeals of Truro, 95 Mass. App. Ct. 378, 384-385 (2019) (describing abutter's ability to pursue zoning enforcement pursuant to G. L. c. 40A, §§ 7, 8, 17).

According to Donovan, this required the Irwins to obtain a variance from the side-yard setback, and whether the variance that the ZBA granted from that setback was valid could not be resolved in the Irwins' favor on summary judgment.

On two separate grounds, the parties contest whether the extension of the reconfigured roof a mere ten inches further into the side yard would materially exacerbate the existing nonconformity. First, the parties disagree whether under the specific wording of the ordinance, a roof overhang of less than three feet is allowed as a matter of right.[18] Second, they disagree whether, in any event, the extra ten inches of intrusion is so de minimis that it could not reasonably be said to increase the garage's "nonconforming nature." Bjorklund v. Zoning Bd. of Appeals of Norwell, 450 Mass. 357, 362-363 (2008) (enumerating examples -- such as construction of dormer -- that, as matter of law, are not deemed to increase nonconforming nature of existing home on undersized lot).[19] We need not

---

[18] The ordinance defines "yard" to exclude "projections of not more than three feet into required yards for such architectural features of a building as . . . eaves." The Irwins argue that this means that eaves that overhang less than three feet do not count as intrusions into a side or front yard. Donovan argues that the definition at most allows eaves to extend three feet past the allowed setback, not three feet beyond a building that already lies well within the setback.

[19] Bjorklund did not involve nonconformity with dimensional requirements such as setbacks. In Bellalta, 481 Mass. at 374, the proposed modifications would cause an incremental increase

resolve either issue. That is because even if the extension of the eaves into the airspace of the side yard were deemed to increase the nonconforming nature of the garage, that increase still would not require a variance. Rather, as noted above, municipal zoning boards are empowered to issue special permits allowing the reconstruction of preexisting nonconforming residences that would increase existing nonconformities so long as they find that the reconstruction would not be substantially more detrimental to the neighborhood.[20] Bellalta, 481 Mass. at 385-386; Gale, 80 Mass. App. Ct. at 336-338. The ZBA made that very finding and Donovan makes no challenge to it. As a matter of law, no variances from the setback requirements were required.

Conclusion. Because no variances were needed and Donovan made no claim during the motion proceedings that the special permits that the ZBA issued to the Irwins were invalid, the

---

in the already nonconforming "floor area ratio" of the home. The court nevertheless questioned whether this would increase the nonconforming nature of the home, characterizing this issue as "hardly self-evident." Id. at 382. Ultimately, the court passed over this question and rested on other grounds. Id.

[20] In his brief and again at oral argument, Donovan argued that the particular language of the height provisions of the ordinance provided that a preexisting nonconforming structure would lose its protected status with regard to existing setback intrusions if it obtained a special permit allowing a height of greater than twelve feet. It suffices to say that the language of the ordinance does not support such a construction.

Irwins were entitled to summary judgment.  Accordingly, we vacate the judgment in favor of Donovan and remand the case for the entry of judgment in favor of the Irwins.

<u>So ordered</u>.